IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Stacey K. Staggers, | ) | C/A No.: 1:13-2999-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civil Rule 73.01(B) (D.S.C.), and the order of the Honorable Richard M. Gergel dated November 25, 2013, referring this matter for disposition. [Entry #9]. The parties consented to a United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [Entry #8].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.    Relevant Background

A.    Procedural History

On August 3, 2010, Plaintiff protectively filed an application for SSI in which he alleged his disability began on August 28, 2009.  Tr. at 174, 191–97.  His application was denied initially and upon reconsideration.  Tr. at 176–79, 185–86.  On April 24, 2012, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Alice Jordan.  Tr. at 106–57 (Hr'g Tr.).  The ALJ issued an unfavorable decision on June 1, 2012, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 69–79.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–4.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on November 4, 2013.  [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 39 years old at the time of the hearing.  Tr. at 108.  He completed the tenth grade and obtained a G.E.D.  Tr. at 112.  His past relevant work ("PRW") was as a concrete laborer and form setter.  Tr. at 114–15.  He alleges he has been unable to work since August 28, 2009.  Tr. at 191.

2.    Medical History

Plaintiff presented to the emergency room at Oconee Medical Center on September 6, 2009, after having fallen on his right elbow.  Tr. at 281.  He was diagnosed with a fracture.  Tr. at 285.

On October 28, 2009, Plaintiff followed up with Dr. Booth for prescription medication refills and sought an injection for shoulder pain. Tr. at 391–94. Plaintiff weighed 378 pounds and his body mass index ("BMI")[1] was 52.0. *Id.* Dr. Booth observed that Plaintiff had tenderness to his long head biceps tendon; decreased range of motion to shoulder rotation, abduction, and extension; and abnormal shoulder range of motion. Tr. at 393. She also indicated that Plaintiff's lab results were abnormal. *Id.*

Plaintiff followed up with Dr. Booth on November 30, 2009, for sores on his abdomen and thigh and for pain medication. Tr. at 384–88. Dr. Booth noted that Plaintiff did not appear to be in pain. Tr. at 385. He weighed 376 pounds and his BMI was 51.7. *Id.* She observed abdominal tenderness and knee joint tenderness. Tr. at 386.

On December 11, 2009, Plaintiff visited Dr. Booth with complaint of severe knee pain. Tr. at 378–81. He requested Percocet for pain. Tr. at 378. Dr. Booth noted that Plaintiff was obese and in obvious pain. Tr. at 379. She also noted that he was walking with a limp, using a cane, had knee joint tenderness, and abnormal knee range of motion. Tr. at 380. Dr. Booth administered a Depo-Medrol injection to Plaintiff's left deltoid. Tr. at 381.

Plaintiff followed up with Dr. Booth on January 25, 2010, for chronic knee pain, obesity, hypertension, and medication refills. Tr. at 372–75. Dr. Booth indicated that he did not appear to be in pain. Tr. at 373. Plaintiff weighed 365 pounds and his BMI was 50.2. *Id.* She noted a limp, hip joint tenderness, knee joint tenderness, and crepitation of

---

[1] BMI is the ratio of an individual's weight in kilograms to the square of his or her height in meters ($kg/m^2$). SSR 02-1p *citing Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults* (NIH Publication No. 98-4083, September 1998).

the bilateral knee joints.  Tr. at 374.  Plaintiff was advised to concentrate on weight loss. *Id.*

Plaintiff presented to the emergency room at Oconee Medical Center on February 25, 2010, complaining of left elbow pain and swelling.  Tr. at 292.  He was diagnosed with bursitis and elbow fracture.  Tr. at 296.

Plaintiff followed up with Dr. Booth on March 1, 2010, to obtain medication refills.  Tr. at 367–71.  Plaintiff complained of left elbow pain, but indicated that it was getting better since his presentation to the emergency room.  Tr. at 367.  He complained of stiffness, joint pain, and swelling.  Tr. at 369.  Plaintiff's weight was noted to be 336 pounds, and his BMI was 46.2.  *Id.*  Dr. Booth observed tenderness, abnormal range of motion, and a limp.  Tr. at 370.

On April 27, 2010, Plaintiff followed up with Dr. Booth for knee pain and low back pain and to obtain medication refills.  Tr. at 363–66.  Plaintiff complained of knee pain and occasional difficulty walking due to pain.  Tr. at 363.  Plaintiff's weight was noted to be 365 pounds and his BMI was 50.2.  Tr. at 364.  Dr. Booth noted that Plaintiff's gait and range of motion were abnormal.  Tr. at 365.  Plaintiff had positive straight leg raise.  *Id.*

Plaintiff was examined by Dr. Booth on May 27, 2010.  Tr. at 359–61.  Plaintiff was noted to be following up for medication refills and to have an exacerbation of chronic low back pain.  Tr. at 359.  He reported muscle pain and weakness.  Tr. at 360.  Plaintiff weighed 365 pounds and his BMI was 50.2.  *Id.*  Dr. Booth noted that Plaintiff was obese.  *Id.*  His lumbar spine range of motion was abnormal and he walked with a

limp.  *Id.*  He had multiple tender points in his spine.  *Id.*  The range of motion of his spine was decreased.  *Id.*  Dr. Booth prescribed pain medication, and instructed Plaintiff to use Tylenol and NSAIDS for mild pain and to only use prescription medication for severe pain.  Tr. at 361.

On June 7, 2010, Plaintiff presented to the emergency room at Oconee Medical Center with complaint of left knee pain after bumping his knee on the corner of a television.  Tr. at 299.

On June 9, 2010, Plaintiff presented to Steven L. Martin, M.D., to follow up after injuring his left knee.  Tr. at 433.  Plaintiff had tenderness and significant soft tissue swelling about the suprapatellar region of the left knee.  *Id.*  Dr. Martin indicated that Plaintiff had probable acute calcific tendinitis in the left quadriceps tendon.  *Id.*

MRI on June 11, 2010, indicated moderate to large knee joint effusion, but no tears of the ACL, PCL, medial meniscus, or lateral meniscus.  Tr. at 470.  There were some mild central degenerative signal changes of the menisci.  *Id.*  Degenerative joint disease and soft tissue swelling were noted.  Tr. at 280.

On June 13, 2011, state agency consultant Martha Durham, Ph.D., completed a psychiatric review technique.  Tr. at 481–94.  She considered Listings 12.04 and 12.06.  Tr. at 481.  She determined that Plaintiff had depression and anxiety that resulted in mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  Tr. at 484, 486, 491.

Plaintiff followed up with Dr. Martin on June 14, 2010, and was walking much better and starting to bend his knee. Tr. at 434.

On July 5, 2011, state agency consultant Frank Ferrell, M.D., completed a physical residual functional capacity evaluation in which he indicated that Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; push and/or pull unlimited; frequently balance and stoop; occasionally climb ramp/stairs, kneel, crouch, and crawl; never climb ladder/rope/scaffolds; and avoid concentrated exposure to extreme heat, humidity, and hazards. Tr. at 495–502.

On August 4, 2010, Plaintiff followed up with Dr. Martin for recurrent left knee pain and swelling. Tr. at 432. Dr. Martin indicated that review of radiographs showed recurrent quadriceps calcific tendinitis post quadriceps tendon repair. *Id.*

On September 10, 2010, Plaintiff returned to Dr. Martin with complaint of left knee pain and swelling and right knee pain. Tr. at 466. It was noted that Plaintiff had lost approximately 50 pounds and that his weight was down from 402 pounds to 352 pounds. *Id.* Dr. Martin recommended continued weight loss. Tr. at 466.

Plaintiff followed up with Dr. Booth on October 19, 2010. Tr. at 436–39. Dr. Booth noted that Plaintiff was doing better and exercising. Tr. at 436. Plaintiff's weight was 352 pounds, and his BMI was 49.1. Tr. at 437. He had normal strength and no muscle weakness, but he had muscle tenderness in his lumbar spine, decreased range of motion of the left knee, and abnormal gait. Tr. at 438.

6

Plaintiff followed up with Dr. Martin on November 10, 2010, and reported that his left knee was doing well, but that he was experiencing arthralgia and swelling in his bilateral hands, bilateral elbows, right shoulder, and bilateral knees. Tr. at 453. He recommended rheumatologic workup. *Id.*

On December 20, 2010, Plaintiff complained of left knee pain to Dr. Booth. Tr. at 440–43. Plaintiff's weight was 360 pounds and his BMI was 50.9. Tr. at 441. Plaintiff's gait was abnormal and he walked with a limp and used a cane. Tr. at 442. Plaintiff had knee joint tenderness, but his range of motion was normal. *Id.*

Plaintiff presented to Stuart M. Barnes, M.D., on February 22, 2011, for a comprehensive orthopedic examination. Tr. at 321–24. Plaintiff's blood pressure was 140/90. Tr. at 322. He was noted to be five feet, 11 inches tall and to weigh 369 pounds. Tr. at 322. Dr. Barnes observed that Plaintiff walked with a very mild antalgic gait, slightly favoring the left side; that he used a straight cane on his right side; that his appearance was neat and clean; and that his build was morbidly obese. *Id.* Plaintiff had moderate decreased range of motion in his bilateral shoulder with moderate crepitance. Tr. at 323. Plaintiff's elbow flexion was slightly diminished to 130 degrees, but Plaintiff otherwise had normal range of motion of his bilateral elbows, wrists, and fingers. *Id.* Plaintiff's upper extremity strength was normal. *Id.* He demonstrated decreased abduction and adduction and slightly decreased internal and external rotation of the lower extremities. *Id.* Plaintiff's knee flexion was decreased. *Id.* Plaintiff's abilities to squat and bend were reduced because of knee pain. *Id.* He had normal range of motion of the bilateral ankles. *Id.* Plaintiff demonstrated reduced range of motion of his lumbar spine.

*Id.*  Plaintiff's heel walk and tandem walk were fair.  *Id.*  His toe walk was poor.  *Id.*  He had normal balance on the right leg, but poor balance on the left leg secondary to knee pain.  *Id.*  Reflexes were slightly reduced, presumably due to soft tissue overlay.  *Id.*  Dr. Barnes assessed morbid obesity; probable calcific bursitis of both shoulders, right worse than left; and degenerative arthritis of the bilateral knees.  *Id.*  Dr. Barnes indicated that Plaintiff's symptoms would not likely improve without weight loss, and that permanent weight loss would likely require bariatric surgery.  *Id.*

On February 28, 2011, state agency consultant Dale Van Slooten, M.D., completed a physical residual functional capacity assessment in which he indicated that Plaintiff was limited as follows: occasionally lift and/or carry 10 pounds; frequently lift and/or carry 10 pounds; stand and/or walk a least two hours in an eight-hour workday; sit about six hours in an eight-hour workday; push and/or pull unlimited; occasionally climbing ramp/stairs, balancing, stooping, and crouching; never climbing ladder/rope/scaffolds, kneeling, and crawling; bilateral overhead reaching limited to frequent; and avoid concentrated exposure to hazards.  Tr. at 328–335.

On March 23, 2011, Plaintiff denied weakness or radiation of low back pain or neurologic complaints.  Tr. at 444.  His weight was 368 pounds and his BMI was 50.6.  Tr. at 445.  Plaintiff's strength was normal, but his lumbar range of motion was abnormal.  Tr. at 446.

On March 28, 2011, Debra C. Price, Ph.D., completed a psychiatric review technique in which she indicated that there was insufficient evidence to indicate that Plaintiff had a psychiatric impairment.  Tr. at 336.

On May 31, 2011, Plaintiff presented to the emergency room at Oconee Medical Center with complaints of left knee injury and pain and left ankle sprain. Tr. at 462–65. Plaintiff indicated that he was carrying a heavy couch down some steps when he missed a step, causing him to twist his ankle and injure his knee. Tr. at 462. He was diagnosed with left knee injury and pain, with possible meniscus injury and left ankle sprain. Tr. at 464.

Plaintiff's left knee was evaluated by P. Sean McCallum, M.D., on June 6, 2011. Tr. at 505. Dr. McCallum noted 2+ effusion of the knee and diffuse joint-line tenderness. *Id.* Plaintiff's x-rays indicated no osseous abnormalities. *Id.* Dr. McCallum recommended a MRI based on Plaintiff's complaints of increased pain and difficulty with weightbearing. *Id.*

MRI of the left knee on June 9, 2011, indicated intact cruciate and collateral ligaments with no evidence of meniscal tear. Tr. at 522. Plaintiff had small joint effusion and mild degenerative changes in all three compartments of his left knee. *Id.*

Plaintiff saw Robert Lemmon, M.D., in Dr. Booth's office on June 21, 2011. Tr. at 545–48. Plaintiff indicated that he had been out of blood pressure medication for two weeks and needed refills. Tr. at 545. Plaintiff weighed 370 pounds and his BMI was 50.9. Tr. at 546.

Plaintiff followed up with Dr. Booth on August 22, 2011, regarding knee pain, low back pain, and walking difficulty. Tr. at 541. Dr. Booth noted that Plaintiff was filing for disability and appeared with a form. *Id.* However, the record contains no evidence to suggest that a form was completed on that date. Plaintiff weighed 368 pounds and his

BMI was 50.6.  Tr. at 542.  Dr. Booth noted that Plaintiff had abnormal gait, abnormal range of motion of the lumbar spine, lumbar paraspinous tender points, and abnormal knee range of motion.  Tr. at 543.  However, knee pain, back pain, obesity, and walking difficulty were noted to be "controlled."  *Id.*

On September 10, 2011, Plaintiff presented to the emergency room at Oconee Medical Center with complaint of swelling and pain in his left arm.  Tr. at 508.  He was diagnosed with a bone spur in the left elbow.  Tr. at 510.  The physician noted that Plaintiff neglected to mention that he was taking Xanax and Lortab, which were filled less than a month prior.  Tr. at 508.

On November 9, 2011, Plaintiff complained to Dr. Booth of acute onset of left elbow pain and swelling.  Tr. at 537.  Plaintiff's weight was 350 pounds and his BMI was 48.1.  Tr. at 538.  Plaintiff's strength and range of motion were normal, but he had tenderness, swelling, and warmth in his left elbow bursa.  Tr. at 539.  Dr. Booth diagnosed gout and olecranon bursitis.  *Id.*

Plaintiff had bloodwork performed at Oconee Medical Center on November 14, 2011, which indicated several abnormalities.  Tr. at 523–25.

On November 21, 2011, Plaintiff followed up with Dr. Booth for diabetes, blood pressure, and medication refills.  Tr. at 533–36.  Plaintiff indicated that his gout pain had resolved with treatment and he had no other complaints.  Tr. at 533.  Plaintiff's weight was 360 pounds and his BMI was 49.6.  Tr. at 534.

Plaintiff again had bloodwork performed at Oconee Medical Center on November 29, 2011, which also indicated some abnormalities.  Tr. at 526–27.

On March 15, 2012, Plaintiff presented to Dr. Booth for follow up regarding blood pressure, diabetes, and pain.  Tr. at 528–32.  Plaintiff sought medication refills and indicated that he had run out of blood pressure medication.  Tr. at 528.  Plaintiff complained of knee flares and low back pain.  Tr. at 529.  He weighed 336 pounds and his BMI was 46.9.  *Id.*  Plaintiff's gait was noted to be normal, but he had paraspinous tender points and abnormal range of motion in his neck, thoracic spine, and lumbar spine. Tr. at 530.  Dr. Booth noted that Plaintiff's diabetes was controlled; that his hypertension was not controlled, but that he was noncompliant; that his pain was controlled; and that his obesity was controlled through weight loss diet.  Tr. at 531.

On July 25, 2012, Dr. Booth completed a questionnaire in which she indicated that Plaintiff's impairments included morbid obesity, chronic joint pain in the knees, back pain, diabetes mellitus, hypertension, and walking difficulty.  Tr. at 562.  Dr. Booth indicated that Plaintiff occasionally experienced pain or other symptoms that were severe enough to interfere with attention and concentration needed to perform even simple work tasks.  *Id.*  She indicated that, "per patient," Plaintiff could sit for two hours at one time. *Id.*  She indicated that Plaintiff could stand for 20 minutes at one time.  *Id.*  Dr. Booth indicated that Plaintiff could sit for about two hours and stand/walk for about two hours total in an eight-hour working day.  *Id.*  She noted that Plaintiff could lift 30 to 40 pounds.  *Id.*  Dr. Booth indicated that Plaintiff could never climb ladders; that he could rarely stoop (bend) and crouch/squat; and that he could occasionally twist and climb stairs.  Tr. at 563.  She indicated that Plaintiff's impairments were likely to produce "good days" and "bad days."  *Id.*  She estimated that Plaintiff would be absent from work

about two to three days per month.  *Id.*  She indicated that emotional factors affected Plaintiff's physical condition, and that he had depression and anxiety.  *Id.*  She indicated that the noted limitations applied after September 10, 2008.  *Id.*  She wrote "[t]he patient cannot work full time at this time due to the many medical issues which are poorly controlled due to his obesity, chronic pain, and hypertension, but the prognosis would improve if he could get insurance and far better follow up care with physical therapy, occupational therapy or specialty treatment plans for pain."  *Id.*

      C.     The Administrative Proceedings

          1.     The Administrative Hearing

              a.     Plaintiff's Testimony

At the hearing on April 24, 2012, Plaintiff testified that he was five feet, 11 inches tall and that he weighed approximately 335 pounds.  Tr. at 109.  Plaintiff testified that his weight had been closer to 400 pounds, but that he had lost weight.  Tr. at 147.

Plaintiff indicated that he was living with his girlfriend and the girlfriend's disabled son.  Tr. at 109, 111.

Plaintiff testified that he completed the tenth grade and obtained a G.E.D.  Tr. at 112.  He indicated that he last worked in 2006.  Tr. at 113.  Plaintiff testified that he worked for a little more than a year as a concrete form setter.  Tr. at 114.  He indicated that he worked as a laborer and machine operator for multiple staffing companies.  *Id.*  He also testified that he worked on an assembly line where he was boxing sheets and pillowcases for approximately six months.  Tr. at 115.  Plaintiff also indicated that he

worked as a cook; that he unloaded trucks; that he worked as an order puller; that he moved furniture; and that he operated a forklift.  Tr. at 116–19.

Plaintiff testified that he spent most of his day in bed and that he had bed sores. Tr. at 123.  Plaintiff indicated that he required assistance when climbing out of the tub and to wash his hair and back.  Tr. at 123, 127.  He testified that family members and friends visited him.  Tr. at 124.  He indicated that he listened to CDs and tapes and watched TV about 70 percent of the time.  *Id.*  Plaintiff indicated that he did not read during a typical day.  Tr. at 125.  He denied cooking, cleaning laundry, washing dishes, vacuuming, mopping, sweeping, dusting, and performing all other chores.  *Id.*  He testified that he went with his girlfriend to shop for groceries at Wal-Mart, but that he rode in a cart.  *Id.*  Plaintiff indicated that his license was suspended in 1998 or 1999 when he had an accident and went to jail on a drug charge.  Tr. at 126.  Plaintiff testified that he smoked cigarettes.  Tr. at 127.  He denied drinking alcohol or using street drugs. Tr. at 127–28.  He testified that he was incarcerated from 2000 to 2003 for selling crack. Tr. at 148–49.

The ALJ asked Plaintiff why he could not perform even a light job.  Tr. at 129. Plaintiff testified that he had gout that mainly caused swelling in his elbows.  Tr. at 130. He indicated that he had pain in his shoulder blades and joints and that his left ankle gave out sometimes.  Tr. at 130–31.

Plaintiff testified that he could sit and stand for twenty minutes at a time.  Tr. at 131.  He indicated that he could walk for approximately 10 minutes.  *Id.*  He testified that

he could lift up 30 to 40 pounds, but that he could lift 20 to 30 pounds comfortably. *Id.* He indicated that he had problems with bending over and climbing stairs. Tr. at 132.

Plaintiff testified that he had surgery to repair quadriceps tendinitis. Tr. at 133. He indicated that he continued to have a limp and to experience swelling and achiness in his left lower extremity. *Id.* He testified that he used ice on his knee about four or five times per month. Tr. at 135. He indicated that he propped a pillow under his left knee while lying in bed during the day. Tr. at 136. Plaintiff testified that he used a cane to ambulate. Tr. at 138.

Plaintiff testified that he did not have the money for an extensive arthritis workup. Tr. at 146.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Kathleen Robbins reviewed the record and testified at the hearing. Tr. at 149–57. The VE categorized Plaintiff's PRW as a concrete laborer and a concrete vault maker as heavy and unskilled. Tr. at 150. The ALJ described a hypothetical individual of Plaintiff's vocational profile who was limited to unskilled, sedentary work with negligible bending of the knees; who could occasionally lift overhead with the bilateral arms; who could stand for no more than two hours of an eight-hour day; who could sit for up to six of eight hours; who could never climb ladders; who could occasionally climb, kneel, crouch, and crawl; who could infrequently balance and stoop; and who should avoid concentrated exposure to heat, humidity, and hazards. Tr. at 151–52. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 152. The ALJ asked whether there were any other jobs in the

14

regional or national economies that the hypothetical person could perform. *Id.* The VE identified the job of cashier, which was classified as light and unskilled in the Dictionary of Occupational Titles ("DOT"), but the VE indicated that 1,400 such positions in South Carolina and 83,400 nationally were performed at the sedentary exertional level. Tr. at 152–53. The VE also identified the job of addresser, which was classified by the DOT as sedentary and unskilled, with 110 jobs in South Carolina and 17,300 jobs nationally; and general office clerk, which was classified by the DOT as sedentary and unskilled, with 560 jobs in South Carolina and 44,800 jobs nationally. Tr. at 153.

Plaintiff's attorney asked the VE to assume the limitations set forth by the ALJ, but to further assume that the individual had to elevate his left leg at waist-level at least three times a day for 20 minute each time. Tr. at 154. Plaintiff's attorney asked if that would affect the jobs identified. *Id.* The VE indicated that it would be considered excessive. *Id.* Plaintiff's attorney asked if it would make a difference whether the breaks to elevate the legs were unpredictable. Tr. at 155. The VE indicated that the restriction would create a problem. *Id.* Plaintiff's attorney asked the VE to consider the earlier hypothetical, but to assume that the individual would be distracted and off task occasionally, which he clarified to mean during one-third of the day. Tr. at 156. He asked how it would affect her answer. *Id.* The VE indicated that the individual would not be employable. *Id.* Plaintiff's attorney then asked the VE to consider the ALJ's hypothetical, but to assume that the individual would be absent from work more than three days per month. *Id.* He asked how that would affect the individual's employability.

15

*Id.* The VE testified that the individual would not be meeting attendance standards and would not be employable. Tr. at 157.

2.    The ALJ's Findings

In her decision dated June 1, 2012, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since August 3, 2010, the application date (20 C.F.R. § 416.971 *et. seq.*).

2.    The claimant has the following severe impairments: morbid obesity, degenerative arthritis of the bilateral knees status post left quadriceps tendon rupture repair, bilateral shoulder bursitis, and gout (20 C.F.R. § 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926).

4.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 416.967(a). I specifically find that the claimant has the sedentary work capacity to lift less than 10 pounds occasionally and to sit for six of eight hours and walk or stand for two of eight hours. The claimant is limited to occasional bilateral reaching overhead. The claimant can never climb ladders, ropes, or scaffolds, can occasionally climb, kneel, crouch, and crawl, and can frequently balance and stoop. The claimant must avoid concentrated exposure to heat, humidity, and workplace hazards. The claimant is limited to unskilled work.

5.    The claimant is unable to perform any past relevant work (20 C.F.R. § 416.965).

6.    The claimant was born on March 28, 1973 and was 37 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 C.F.R. § 416.963).

7.    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 416.964).

8.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R Part 404, Subpart P, Appendix 2).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

16

national economy that the claimant can perform (20 C.F.R. §§ 416.969, and 416.969(a)).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since August 3, 2010, the date the application was filed (20 C.F.R. § 416.920(g)).

Tr. at 74–79.

D.    Appeals Council Review

On July 23, 2012, Plaintiff filed a request for review of hearing decision/order with the Appeals Council.  Tr. at 63.  On September 5, 2013, the Appeals Council issued a notice denying Plaintiff's request for review.  Tr. at 1–4.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    The ALJ failed to consider Plaintiff's obesity as required by Social Security Ruling 02-1p; and

2)    Post-hearing evidence supports Plaintiff's allegations.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

17

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents him from doing substantial gainful employment.  *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary.  20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can

---

[2]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity.  20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the

Commissioner applied the proper legal standard in evaluating the claimant's case.  *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational.  *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision."  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Consideration of Obesity Under Social Security Ruling 02-1p

Plaintiff argues that the ALJ did not properly consider Plaintiff's obesity and its effects on his other impairments and his ability to function.  [Entry #12 at 5].  Plaintiff further argues that the ALJ did not properly evaluate Plaintiff's obesity in steps two, three, four, and five of the sequential evaluation process.  *Id.*  Plaintiff contends that the

ALJ failed to analyze whether Plaintiff's obesity met or equaled a Listing and failed to consider how it affected Plaintiff's RFC. *Id.*

The Commissioner argues that the ALJ properly considered Plaintiff's obesity at step two by determining that it was a severe impairment and by considering it in making her findings throughout the sequential evaluation process. [Entry #13 at 11]. The Commissioner maintains that obesity is not a Listed impairment, and that the ALJ considered whether Plaintiff's impairments medically equaled Listings 1.02 and 14.09. [Entry #13 at 11–12]. The Commissioner points out that Plaintiff fails to identify any particular Listing that the ALJ should have considered, and that Plaintiff has the burden of showing that his impairments meet or equal one of the Listed impairments. [Entry #13 at 11]. The Commissioner argues that Plaintiff alleges no specific error at steps four and five to support his allegation that the ALJ erred in considering obesity at these steps. [Entry #13 at 12]. Furthermore, the Commissioner argues that the ALJ did consider Plaintiff's obesity at steps four and five because she assessed significant limitations and adopted the opinion of state agency physician Frank Ferrell, which made several references to the effects of Plaintiff's obesity. [Entry #13 at 13].

Social Security Ruling 02-1p was enacted to provide guidance on Social Security's policy concerning the evaluation of obesity claims following the deletion of Listing 9.09, Obesity. SSR 02-1p. Obesity is generally defined as having a BMI of 30.0 or above. *Id. citing Clinical Guidelines of the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults* (NIH Publication No. 98-4083, September 1998). The ALJ should consider obesity in determining whether the individual has a medically

determinable impairment; whether the individual's impairment is severe; whether the individual's impairment meets or equals the requirements of an impairment in the Listings; and whether the individual's impairment prevents him from performing past relevant work or other work that exists in significant numbers in the national economy. *Id.*

At step two of the sequential evaluation process, obesity is considered a severe impairment when it significantly limits an individual's physical or mental ability to perform basic work activities. *Id.*

At step three of the sequential evaluation, the Commissioner will find that an individual with obesity meets the requirement of a Listing if he or she has another impairment that, by itself meets the requirements of a Listing or if the other impairment, in combination with obesity, meets the requirements of a Listing. *Id.* "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis added). Obesity may also be considered medically equivalent to a Listing when it is at least equal in severity and duration to the criteria of a Listing. SSR 02-1p. *See also* 20 C.F.R. § 404.1526(a). Medical equivalence may also be found if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment. SSR 02-1p.

"In evaluating a claimant's impairment, an ALJ must fully analyze whether a claimant's impairment meets or equals a 'Listing' where there is factual support that a listing could be met." *Huntington v. Apfel*, 101 F. Supp. 2d 384, 390 (D. Md. 2000),

*citing Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986) (remanded, in part, because of ALJ's failure to specifically identify relevant Listing and compare each of the listed criteria to the evidence of the claimant's symptoms). The ALJ's analysis must reflect a comparison of the symptoms, signs, and laboratory findings concerning the impairment, including any resulting functional limitations, with the corresponding criteria set forth in the relevant Listing. *Id.  See* 20 C.F.R. § 416.926a.

At steps four and five, the Commissioner considers that obesity causes limitation of function and may affect a claimant's RFC and his ability to perform past work and other substantial gainful activity. SSR 02-1p. "[W]e will consider any functional limitations resulting from the obesity in the RFC assessment" and "will explain how we reached our conclusions on whether obesity caused any physical or mental limitations." *Id.*  When a claimant has multiple impairments, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of these impairments in determining the claimant's disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The Commissioner is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. "As a corollary, the

ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.*

The undersigned finds that the ALJ adequately assessed Plaintiff's obesity at step two of the sequential evaluation process. The ALJ found that obesity was a severe impairment. This was supported by indications in Plaintiff's medical records that Plaintiff's BMI was well over 30.0 and that his weight affected his ability to do some basic work activities.

The undersigned finds that the ALJ adequately assessed Plaintiff's obesity at step three in the sequential evaluation process and properly concluded that Plaintiff's impairments did not meet or equal a Listing. To meet or equal a Listing, Plaintiff's obesity, either alone or in combination with another impairment or impairments, needed to be as severe as or as functionally limiting as a Listed impairment. *See* SSR 02-1p. Because the record suggested that a Listing may be met, the ALJ was required to address and discuss potentially applicable Listings, which she did. The ALJ indicated that she considered Listing 1.02 with respect to Plaintiff's knee and shoulder arthritis. Tr. at 74. The ALJ also considered Plaintiff's gout under Listing 14.09. Tr. at 75. She provided reasons for concluding that Plaintiff's impairments failed to meet or medically equal these Listings, which were based on the fact that Plaintiff's combination of impairments were not as severe as or as functionally limiting as required by the Listings. Listing 1.02 requires either inability to ambulate effectively or inability to perform fine and gross movements effectively. 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, §1.02. The ALJ specifically found that Plaintiff did not have either of these limitations. Tr. at 74–75.

She also indicated that her rationale regarding upper and lower extremity mobility applied to Plaintiff's gout, as evaluated under Listing 14.09(a). Tr. at 75. Plaintiff neglected to cite to any particular Listing that his impairments met or medically equaled, and the undersigned's review does not reveal factual support that any other Listing could be met. Therefore, the ALJ's consideration of Listings 1.02 and 14.09 was adequate.

The undersigned finds that the ALJ properly considered Plaintiff's obesity in determining Plaintiff's RFC and ability to engage in work activity at steps four and five of the sequential evaluation process. The ALJ indicated that she considered Plaintiff's morbid obesity and knee arthritis severe and factored the impairments into her determination of Plaintiff's RFC. Tr. at 76. The ALJ also indicated that she considered chronic fatigue associated with obesity in assessing a mental-related limitation. Tr. at 77. Finally, the ALJ specifically indicated that she considered Plaintiff's obesity when assessing environmental limitations. *Id.* The ALJ explicitly indicated that she considered Plaintiff's obesity in her decision and she assessed limitations that were consistent with that consideration. She then concluded at step four, based on that RFC assessment, that Plaintiff could not perform PRW. Tr. at 77–78. She proceeded to step five, where she identified jobs that Plaintiff could perform in light of the restrictions that were supported by the record. Tr. at 78.

The undersigned finds that the ALJ properly considered Plaintiff's obesity in accordance with the framework set forth in Social Security Ruling 02-1p and the sequential evaluation process set forth in 20 C.F.R. § 404.1520.

2.      Post-Hearing Evidence

Plaintiff argues that the opinion of Plaintiff's treating physician, Linda Booth, M.D., which was rendered after the hearing, supported a finding that Plaintiff was disabled.  [Entry #12 at 6].  While the Plaintiff does not specifically state this proposition, the undersigned assumes that the Plaintiff is arguing that this was new and material evidence that the Appeals Council should have considered to be significant enough for the claim to be remanded.

The Commissioner argues that substantial evidence supports the ALJ's decision, even with the addition of Dr. Booth's opinion.  [Entry #13 at 14].  The Commissioner distinguishes this case from *Meyer v. Astrue*, 662 F.3d 700 (4th Cir. 2011), in that this ALJ did not draw any particular inference from the lack of a treating source opinion in the record and in that Dr. Booth's opinion did not corroborate other opinion evidence in the record at the time of this ALJ's decision.  [Entry #13 at 15–16].  The Commissioner also notes that Dr. Booth's statement is inconsistent with indications in her treatment notes that Plaintiff's impairments were "controlled."  [Entry #13 at 16]

The regulations "specifically permit claimants to submit additional evidence, not before the ALJ, when requesting review by the Appeals Council."  *Meyer*, 662 F.3d at 705.  "If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."  20 C.F.R. § 404.970(b).  "Evidence is new 'if it is not duplicative or cumulative' and is material if there is 'a reasonable possibility that the new evidence would have changed the outcome.'"  *Meyer*, 662 F.3d at 705, *citing*

*Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991). If the new and material evidence relates to the period on or before the date of the ALJ's hearing decision, the Appeals Council should evaluate it as part of the entire record. 20 C.F.R. § 970(b).

The Fourth Circuit's decision in *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340–41 (4th Cir. 2012), suggests that evidence created after the ALJ's decision may be considered as new and material evidence and given retrospective consideration under certain circumstances. While *Bird* specifically addressed whether evidence created after a claimant's date last insured could be considered to prove disability arising before the date last insured, it follows that the same logic could be applied to a case in which evidence arises after the date of an ALJ's decision, but before the Appeals Council makes a decision to grant or deny review.

The Commissioner recognizes the opinions of treating physicians are to be entitled to greater weight than other evidence and has enumerated particular factors for ALJs to consider when evaluating those opinions. *See* 20 C.F.R. § 416.927(c). If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam); *see*

*also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d, 171, 176 (4th Cir. 2001).

20 C.F.R. § 416.927(c) provides that, if a treating source's opinion is not accorded controlling weight, the ALJ should consider "all of the following factors" in order to determine the weight to be accorded to the medical opinion: examining relationship; treatment relationship, including length of treatment relationship and frequency of examination, nature and extent of treatment relationship, and supportability; consistency with the record as a whole, specialization of the medical source; and other factors. *See also Johnson*, 434 F.3d at 654.

While the ALJ has to either accord controlling weight to the treating physician's opinion or specifically address the factors identified in 20 C.F.R. § 416.927(c) and indicate the weight given, the same standards do not apply when a medical opinion is submitted to the Appeals Council that was not in the record at the time of the ALJ's decision. In *Meyer*, the Fourth Circuit considered whether a medical opinion from a treating physician rendered after the ALJ's decision and submitted to the Appeals Council was new and material evidence warranting remand. While recognizing that "analysis from the Appeals Council or remand to the ALJ for such analysis would be particularly helpful when new evidence constitutes the only record evidence as to the opinion of the treating physician," the court also found that "the lack of such additional

fact finding does not render judicial review 'impossible'—as long as the record provides 'an adequate explanation of [the Commissioner's] decision.'"  *Meyer,* 662 F.3d at 706–07 *citing Martinez v. Barnhart*, 444 F.3d 1201, 1207–08 (10th Cir. 2006).  If the Appeals Council finds that the ALJ's "action, findings, or conclusion is contrary to the weight" of all evidence, including the new and material evidence, the Appeals Council should grant the request for review and either issue its own decision on the merits or remand the case to the ALJ.  *Id.* at 705 *citing* 20 C.F.R. § 404.970(b).  However, if after considering all evidence, the Appeals Council decides that the ALJ's actions, findings, and conclusions were not contrary to the weight of the evidence, the Appeals Council can deny review with or without explaining its rationale.  *Id.* at 705–06.

While the Appeals Council did not specifically discuss Dr. Booth's opinion in its denial, it indicated that it considered the evidence and included it in the record at B14F.  Tr. at 1, 5.  The Appeals Council concluded that the new evidence did not provide a basis for changing the ALJ's decision.  Tr. at 2.

The undersigned finds that the record provides an adequate explanation of the Commissioner's decision and that Dr. Booth's opinion did not provide a basis for remanding the case to the ALJ.  The undersigned is not entirely convinced that the opinion at issue is, in fact, purely Dr. Booth's opinion in light of the fact that it indicates "per patient" on the form and provides responses that are strikingly consistent with the restrictions that Plaintiff indicated during the hearing.[4]  See Tr. at 562–63.  Nevertheless,

---

[4] Dr. Booth's opinion is dated July 25, 2012, which was over three months after the hearing.  Plaintiff testified at the hearing that he could stand for 20 minutes at a time and Dr. Booth indicated that he could stand for 20 minutes at a time.  *See* Tr. at 131, 562.

even if we were to assume that the opinion is entirely that of Dr. Booth, the opinion itself does not outweigh the entirety of the evidence, which suggests that Plaintiff's impairments were not as limiting as Dr. Booth stated in the July 25, 2012 document. While the ALJ did not have the opportunity to review Dr. Booth's opinion when she made her decision, she cited persuasive evidence that was contrary to it. The ALJ noted that she limited Plaintiff to simple tasks due to his physical pain and medication side effects, but that Plaintiff had indicated on a function report that he could pay attention for a long time, followed written and spoken instructions pretty well, and finished what he started. *See* Tr. at 75, *citing* Tr. at 233. This is contrary to Dr. Booth's opinion that Plaintiff would be off task occasionally throughout the workday. *See* Tr. at 156. The ALJ also indicated that radiographic evidence and clinical findings from the consultative examination and the orthopedist's records did not support Plaintiff's indications to Dr. Barnes that he required a cane to ambulate and could not stand for more than 30 minutes at a time. *See* Tr. at 76–77. The ALJ discussed Dr. Booth's records, which indicated normal range of motion of the knees and normal gait during some examinations. *See* Tr. at 77 *citing* Tr. at 442, 446, 530. While the ALJ was addressing Plaintiff's allegations, the same logic follows with respect to Dr. Booth's opinion because she indicated that Plaintiff's standing ability was limited to 20 minutes. *See* Tr. at 562. The ALJ also considered the opinion evidence that was in the file at the time of the hearing and explained the findings that she adopted from those opinions. *See* Tr. at 77. The

---

Plaintiff testified that he could lift a maximum of 30–40 pounds and Dr. Booth indicated that he could lift 30–40 pounds. *See id.* Plaintiff's attorney questioned the VE about the implications of an individual being off task occasionally and Dr. Booth indicated that Plaintiff would occasionally be off task. Tr. at 156, 562.

explanation provided by the ALJ suggests that Dr. Booth's opinion was unsupported by some of her own treatment records, divergent from some of Plaintiff's reports, unsubstantiated by the objective evidence, inconsistent with the findings of other examining physicians, and contrary to other opinion evidence in the record.   Therefore, after considering the record as a whole with the addition of Dr. Booth's July 25, 2012 statement, the undersigned finds that substantial evidence supports the ALJ's decision.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law.  Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

August 26, 2014                              Shiva V. Hodges
Columbia, South Carolina                     United States Magistrate Judge